**N.D. McN., Appellant,**

v.

**R.J.H., SR., Appellee.**

**No. 06–FM–481.**

District of Columbia Court of Appeals.

Argued Nov. 1, 2007.

Decided Sept. 3, 2009.

---

Gregory Brown and Ronald M. Jacobs, with whom Daniel E. Toomey, Washington, DC, was on the brief, for appellant.[1]

Before RUIZ, KRAMER and FISHER, Associate Judges.

RUIZ, Associate Judge:

N. McN. appeals the award of primary physical custody of her two children during the school year to the children's father,

---

[1] Appellee, R.J.H., Sr., did not take part in this appeal. On the eve of oral argument, the court received a communication from appellee indicating that until that day he was not aware of the appeal. As we are affirming the order of the trial court, any lack of notice to appellee, and the consequent lack of briefing or argument from appellee, does not prejudice him.

appellee, R.J.H., Sr. On appeal, she argues that the trial court erred in basing its decision on an *in camera* interview with the children outside the presence of appellant or her counsel, and without any recording of the interview available to them or to this court. Appellant also argues that the trial court erred in finding that one of the boys was "at risk" under her care. We agree that *in camera* interviews, even if permitted, must be recorded. We conclude, however, that the lack of recordation did not prejudice appellant in this case. As we find no error in the trial court's findings, we affirm the child custody order.

## I.

This matter came before the trial court on the parties' competing complaints for custody of their two children, V. and B., who were respectively fourteen and ten years old at the time.[2] After two days of trial, the judge decided to interview the boys *in camera*, with appellant's consent.[3] The trial judge announced that she was not going to place the children under oath and that the interviews were going to be conducted privately, that is, "without attorneys present .... and without the parents present also." The trial judge did not reveal, however, that the session would not be recorded, and there was no discussion on the subject.

On March 20, 2006, approximately a month after trial, the judge issued a Custody Order, which granted joint legal custody to the parents and primary physical custody during the school year to appellee, who lives in North Carolina. The trial court relied primarily on the children's wishes, and on V.'s difficulties adjusting to his home and school while living with appellant. The court found, *inter alia*, that "[t]he children love both their parents, but they want their father to be their primary custodian," and that their "preference is a strong one." "In the court's interviews with the children, the Court tested their preference by asking challenging questions, and the children responded by expressing an unambivalent desire to live with [their father]."

With regard to V., the oldest child, the trial court found that

[w]hile living with his mother, however, [he] has significant problems with adjustment to his home and school. He loves his mother, but feels strongly that he does not want to live with her any more. He feels entitled to live with his father because she has told him he may do so if he chooses. He and his mother argue a lot. While there is nothing unusual about a 14–year–old arguing with a parent, their frequent arguing is another indication of his negative adjustment. His poor performance at school is particularly worrisome. He was suspended for fighting this school year—a

2. Although the parties were on the verge of marriage on two occasions, they have never been married, but lived together for less than a year in Chadbourn, North Carolina, in 1994, when V. was two years old. Appellant moved back to the District of Columbia to be near her family, but her relationship with appellee continued. Appellee left his employment with the Secret Service to work as a long-haul trucker, and visited appellant and their son about four times a month. The second son, B., was born in 1996. Although their romantic relationship ended at some

point between 1996 and 1999, appellant encouraged appellee to continue visiting to preserve the children's relationship with him, and appellee has done so. As of the time of trial, appellant was in "a committed relationship" with another man, and appellee was married to another woman.

3. As appellant's counsel stated, "I have no objection to Your Honor conducting informal interviews with the children not under oath."

problem that has persisted for years. This past grading period, he failed two subjects.

[V.'s] difficulties with adjustment have existed for several years and have gotten worse despite Ms. [McN.'s] responsible attempts to correct them. When a teacher called with reports of disrespect, [appellant] left her job and met the child in the school bathroom to discipline him; concerned about his school environment and behavior, she volunteers at his school once a week and attends many of his classes; when he fails a course, she enrolls him in tutoring.

Ms. [McN.'s] many attempts to set [V.] on the right course have not prevented a downward slide. At times she has concluded that she is not the parent best able to bring him into adulthood and has called [R.J.H., Sr.] to have him assume custody. On each occasion, however, her desire to be with [V.] has won out, and she has cancelled her offer of custody.

Notwithstanding Ms. [McN.'s] responsible parenting, [V.'s] poor adjustment is likely to continue if he remains with her. His academic performance has declined over the years, producing two failures in the most recent grading period; suspensions in prior years have not kept him from getting into fights or from being suspended again this year. Continued declines will predictably lead, as they have in the past, to friction at home and his desire to live elsewhere. An underachieving and angry teenager may easily be tempted by others to participate in serious wrongdoing.

In addition to the children's wishes and V.'s "difficulties with adjustment," the trial judge considered the wishes of the parents and the sincerity of their competing requests for custody; the children's ages and their interaction and interrelationship with their parents, siblings, and other persons who may emotionally or psychologically affect their best interests; the children's adjustment to their home, school, and community; the mental and physical health of everyone involved; the capacity of the parents to communicate and reach shared decisions affecting the children's welfare; the willingness of the parents to share child custody; the prior involvement of each parent in the children's lives; the potential disruption of the children's social and school life; the geographic proximity of the parental homes as it relates to the children's residential schedule; the demands of the parents' employment, and their ability to financially support a joint custody arrangement. The trial judge also considered an intrafamily offense committed by appellee in 1999 in which he assaulted appellant. *See* D.C.Code § 16–914 (2001) (setting out factors to be considered in making custody determination).

Appellant challenges the trial court's decision to grant primary physical custody (during the school year) to appellee based on the court's assessment of the children's preference gleaned during the unrecorded informal interviews and its finding that V. would be "at risk" if he continued to live with his mother.

## II.

Appellant argues that the lack of a transcript of the judge's *in camera* interviews with the children renders the record insufficient for this court to conduct meaningful appellate review of the judge's decision in a case where the judge relied heavily on what she learned during the interviews in deciding to grant physical custody of the children during the school year to the father. Further, appellant argues, her due process rights were not adequately protected because she was not given the opportunity to test the accuracy of the facts

related by the judge concerning the *in camera* interviews.

■ Where there has been no objection at trial to an alleged error, as here, this court will usually apply "plain error" review and reverse only upon a showing that 1) there was error, 2) the error was obvious or plain, and 3) the error "affected substantial rights." *See United States v. Olano,* 507 U.S. 725, 732–34, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). If those three conditions are met, the court has discretion to notice the error and reverse if it resulted in a miscarriage of justice or seriously affected the fairness and integrity of the trial. *See id.* at 736, 113 S.Ct. 1770. It is not at all clear, however, that in the circumstances of this case, where the claimed error is the lack of recordation, it would be fair to require appellant to object when counsel was not present at the *in camera* interviews and therefore was unaware of the conditions under which the interviews were conducted. We do not need to decide the issue, however, because we conclude that even under plenary review, appellant is not entitled to reversal.

■ Although we have not heretofore had an opportunity to discuss in what circumstances and under what conditions a trial court may conduct *in camera* interviews of children who are the subject of child custody proceedings, we have addressed a related issue in the context of neglect proceedings. In *In re Jam.J.,* 825 A.2d 902 (D.C.2003), we held that in neglect cases, trial judges have the power to protect a child from the harmful effects of being forced to testify at trial, usually by imposing reasonable conditions and restrictions on the conduct and scope of a child's examination—and in extreme situations by precluding the questioning altogether. *See id.* at 916. *In re Jam.J* set out a balancing test in which trial judges must first determine, based on concrete individualized evidence, whether testifying in court would create a risk of serious harm to the child, and, if so, then consider whether the risk can be alleviated by means short of prohibiting the questioning altogether, such as through the use of closed-circuit cameras so that the child can testify "out of the physical presence" of the parent accused of neglect. *Id.* at 917. After taking into consideration the risk of harm to the child and the possibility of ameliorative measures, trial judges must evaluate "the probative value of the child's testimony and the parents' concomitant need for it." *Id.* at 918. *In re Jam.J* also suggested that trial courts may explore alternatives to taking testimony from the child and, in certain circumstances, "so long as the court acts with due regard for the rights of the parent *and the creation of an adequate record,* [did] not rule out the possibility of assessing the importance of the child's testimony by means of an informal *in camera* interview." *Id.* (emphasis added).

Similarly, in termination of parental rights (TPR) cases, where we have expressed a strong preference, grounded in the statute, for judges "to hear directly from the children involved ... if it is at all feasible to do so," we have said that

[t]he choice between having a conversation with a child in chambers and putting that child on the witness stand is, of course, within the judge's sound discretion. As we suggested in *In re T.W.,* the judge can tailor the proceeding to fit the situation:

At least part of the concern a judge may have about a child's being asked to "take sides" can be alleviated by a nonadversarial inquiry *in camera,* without necessarily shrinking from questions about the child's preference.

*In re I.B.,* 631 A.2d 1225, 1232 n. 12 (D.C. 1993) (quoting *In re T.W.,* 623 A.2d 116,

118 (D.C.1993)). It is clear, therefore, that we have approved the use of *in camera* interviews in neglect and TPR proceedings as a way of eliciting a child's views and preferences where necessary to protect children from the documented likelihood of serious harm.[4]

The same rationale supports the use of *in camera* interviews of children in custody disputes between parents. As in TPR cases, the primary objective of the trial court in a custody case is the best interest of the child. *Compare* D.C.Code § 16–2353(a) (2001) ("A judge may enter an order for the termination of the parent and child relationship when the judge finds ... that the termination is in the best interests of the child") *with* D.C.Code 16–914(1)(A) (The court may order sole legal custody, sole physical custody, joint legal custody, joint physical custody, or "any other custody arrangement the Court may determine is in the best interest of the child"). *See Ysla v. Lopez,* 684 A.2d 775, 776 (D.C.1996) (applying same standards to resolution of child custody whether parents are married or unmarried). The overriding object of safeguarding the child's best interest necessarily includes the conduct of the pro-

ceeding itself, by protecting a child from the harmful effects of in-court testimony. *See In re Jam.J.,* 825 A.2d at 911 ("TPR proceedings evoke similar, if not the same, concerns about the emotional impact on children from testifying as do neglect proceedings."). As in the case of the TPR statute, D.C.Code § 16–2353 (2001), the statute governing child custody, D.C.Code § 16–914 (2001), requires that the judge consider the child's wishes, "where practicable." Eliciting those wishes can present a challenge, however, as a child's choice between parents is often emotionally wrenching, and announcing that choice in open court could add significantly to the child's emotional toll. We hold, therefore, that in custody trials where there is a firm factual foundation that such harm may result if a child is made to testify in court, judges may use *in camera* interviews to obtain necessary information from children.

 The fact that a judge obtains information *in camera* does not mean, however, that the interview may be conducted in a completely informal way, without "due regard for the rights of the parent and the creation of an adequate record."[5] *In re*

---

**4.** The 1995 District of Columbia Code of Judicial Conduct prohibits judges from "initiat[ing], permit[ing], or consider[ing] ex-parte communications, or consider[ing] other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that ... [a] judge may initiate or consider any ex-parte communications when expressly authorized by law." DISTRICT OF COLUMBIA CODE OF JUDICIAL CONDUCT Canon 3 B.(7)(e) (1995). The 2007 ABA Model Code of Judicial Conduct is to the same effect. *See* ABA MODEL CODE OF JUDICIAL CONDUCT R. 2.9 (2007).

An *in camera* interview is an ex-parte communication. *See Harris v. United States,* 738 A.2d 269, 277 (D.C.1999) (*"Ex parte* communications are 'those that involve fewer than all the parties who are legally entitled to be present during the discussion of any matter' and are prohibited in order to 'ensure that every

person who is legally interested in a proceeding [is given the] full right to be heard according to law.' ") (alteration in original). When an *ex parte* communication is permitted by case law, as it was in this case, where the trial judge was attempting to find out the children's wishes as part of her responsibility to make a decision in their best interest, and the parents had consented, the *ex parte* communication is "expressly authorized by law." *See* DISTRICT OF COLUMBIA CODE OF JUDICIAL CONDUCT, "Terminology" (defining "law" as including "decisional law").

**5.** We note that in addition to the requirement that there must be an adequate record of the child's interview that the parties can review after the fact, there might be ways for counsel to observe and perhaps listen to *in camera* proceedings as they occur, either through the use of a one-way mirror or closed-circuit

*Jam.J.*, 825 A.2d at 918. A parent's right to the care, custody and management of a child has constitutional protection as a liberty interest, *see Santosky v. Kramer*, 455 U.S. 745, 753–54, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and courts must conduct proceedings that implicate that right according to due process principles. Due process includes the right to present evidence and argument to the trial court and, where a right to appeal is provided by statute, to appeal from an adverse ruling. *See M.L.B. v. S.L.J.*, 519 U.S. 102, 107, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (holding that a state in which civil litigants have a general statutory right to appeal from state court decisions, it is inconsistent with the due process and equal protection clauses to condition a mother's right to appeal from the court's civil order terminating her parental rights on her ability to prepay record preparation fees); *Lehr v. Robertson*, 463 U.S. 248, 259, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) ("[T]he Court held that the Due Process Clause was violated by the automatic destruction of the custodial relationship without giving the father any opportunity to present evidence regarding his fitness as a parent") (citing *Stanley v. Illinois*, 405 U.S. 645, 649, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)). In order to have an opportunity for meaningful presentation of evidence and argument, a litigant must have access, both in the trial court and on appeal, to the evidence that can be (or has been) used by the judge in ruling against her. *See Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 289, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) ("A party is entitled, of course, to know the issues on which decision will turn and to be apprised of the factual material on

which the [decision-maker] relies for decision so that he may rebut it. Indeed, the Due Process Clause forbids [a decision-maker] to use evidence in a way that forecloses an opportunity to offer a contrary presentation."). And meaningful appellate review can only be had if there is a record that allows the parties to challenge, and the appellate court to evaluate, the evidence and reasoning that underlies an adverse decision.

Moreover, the statute creating the Superior Court provides that it "shall be a court of record in the District of Columbia...." D.C.Code § 11–901 (2001). A court of record "is required to keep a record of its proceedings. The court's records are presumed accurate and cannot be collaterally impeached." BLACK'S LAW DICTIONARY 380 (8th ed. 2004).

■ Therefore, although trial judges are permitted, in certain circumstances, to interview children *in camera* out of the glare and pressure of the courtroom, because the interview is still part of a court proceeding, we conclude that it must be recorded, and that the record must be made available to the parties and the appellate court. *See Hicks v. Hicks*, 733 So.2d 1261, 1267 (La.Ct.App.1999) ("[T]he law in this circuit requires that an 'in chambers' interview of a child in a child custody case 'must be conducted with a reporter present and a record made of the questioning by the court and the answers of the witnesses.'"); *Foskett v. Foskett*, 247 Mich.App. 1, 634 N.W.2d 363, 368–69 (2001) ("The only conceivable explanation to account for the stark difference between the evidence presented on the record that amounted to nothing more than mere *alle-*

---

cameras. *See In re Jam.J.*, 825 A.2d at 911 (noting the availability of closed-circuit cameras to receive the child's testimony "out of the physical presence" of parents). We merely mention these as possibilities to be consid-

ered by trial judges, subject to technical, logistical and other constraints. Counsel and judges may devise other techniques that can serve to protect children and safeguard the due process rights of litigants.

*gations* of the mother's violent conduct and the trial court's *conclusions* that the mother has a 'volatile[ ]' ... temper[,] ... is the intervening in camera interview with the children that was not, in any way, made part of the reviewable record.... [T]here must be a modicum of extraneous testimony on the record that would ... support a reasonable inference attesting to the trustworthiness ... of the information obtained through the in camera interview with the children."); *Romi v. Hamdan,* 70 A.D.2d 934, 417 N.Y.S.2d 523, 524 (1979) ("[T]he failure to conduct the interview with the child on the record, especially where paramount importance was given to the child's wishes, makes intelligent review by this court impossible.") (citation omitted); *Donovan v. Donovan,* 110 Ohio App.3d 615, 674 N.E.2d 1252, 1255 (1996) ("[We] hereby require trial courts to make a record of any *in camera* interview with children involved in custody proceedings, to be kept under seal for review on appeal as was done in this case."); *Cyran v. Cyran,* 389 Pa.Super. 128, 566 A.2d 878, 879 (1989) ("[T]he court should supplement the record with a transcript of [the child's] *in camera* testimony. When a hearing judge interviews a child in a custody case, the testimony must be transcribed and made a part of the record."). Because in this case the judge's interviews with the children were not recorded, there was error, and we turn to consider whether that error requires reversal in this case.

■ Appellant argues that the lack of a record of the interview makes it impossible for us to ascertain whether the trial court's decision was drawn from a firm factual foundation. Appellant cites cases from other jurisdictions holding that failing to make a recording of an *in camera* interview of a child in a custody case "is not harmless error, as such action by a trial court makes impossible our ability to thor-oughly and properly review the record of the trial between the parties." *Hicks,* 733 So.2d at 1267. In *Hicks,* however, there was *absolutely* no record made of either the court's questioning, or the child's answers. *See id.* Here, on the other hand, the trial judge was well aware that the parties had not been privy to the *in camera* interview and sought to address it by relating to the parties in open court a detailed narration of the substance of the interviews and the specific parts that concerned her before counsel proceeded to closing arguments. The trial judge stated:

> I don't want, if I can[ ] avoid it, for the parents to be exposed for the first time to any issue or concern in my opinion when they haven't heard it before and haven't had an opportunity to address it in argument.... I asked the children to describe a typical day, which they did, and other conversational matters. But I would say that one of the real cruxes of what I wanted to say to the kids was, I'm confused. Your mom has taken care of you for your entire lives on a day-to-day basis. She's the one who has had that responsibility, and you spend a lot of time with your father over summertime, and you're both bright and intelligent and terrific kids, I would say to each kid, and so, why in the world should that be changed? And why do you want it to be changed? You're doing fine, and they each had an answer for that, and I asked them directly, and I said, look, I said, the school year is business time, you know, get up early, go to school, come home, do your homework, and there's a lot of business interaction and a lot of things that have to be done, and it's business. And you go to your dad during the summer and it's play dad and step mom. You know, how can you compare the two, and wh[y] is it fair to compare the two? And I asked them that, and they had their answers to

those questions.... When I asked, when I ask [V.] [who was almost fourteen at that time] why I shouldn't keep it the same ... he said, well, I've spent the first part of my life with my mom, and now I want to spend time with my dad. And to him, that's fairness. He said, since I was 11, my mom told me that ... you can live with him if you want. But now that I want to, she won't let me go. And that's what [V.] said. It's clear to me from talking to them that they very much prefer the quality of their life in North Carolina. They love their mom. They're already thinking of ways they can see their mom during the school year if they want to go to North Carolina, well, I can come see her on school vacations, there's spring, there's Christmas.

... Their life in Washington, D.C., as they told me in the conference room, is if they wake up at 5:20 and then they get their breakfast and they do other things and mom drops [the] daughter off at school and [B.] off at his grandparents, and [V.] off at the train, and then he takes the train and he gets to school early and goes to the auditorium. And then, they come home after school, and there is homework time and you sit around the table and you take the plant off the table, and if people haven't finished their homework in after school care or some other way, everybody is around the table and mom checks the homework, and then all the other things about being involved in the PTA and so on.

And [V.], in his report card, he said, in my latest report card, I failed two courses and he's taking tutoring.... When exposed to a different rhythm of life where they don't have to wake up at 5:20 in the morning, and there is a whole different atmosphere and relationship system and leisure activities and every-

thing else, they prefer that other kind of life. It's legitimate to have that preference. That's their preference.... And I asked [B.], would you tell me about that time when you got so angry at [appellee's wife]? And he told me that she had hit him on his tooth, that was painful. She first hit his tongue, and then her finger flicked up and hit his tooth. And then in the course of things, [B.] said that you, Ms. [McN.], hit him once when you were wearing a ring and his nose started to bleed all over his shirt and then you threw the bloody shirt out, and he was crying when he told that story.... I heard from [V.] that Ms. [McN]. calls about twice a week when the kids are in North Carolina and talks for a long time to both kids. And they complain, both kids complain about an argumentative household.... And so, pending argument, those are my thoughts and those are my conversations with the children.... And I asked [B.] questions to try to enable me to determine if he really had a sincere preference to staying with mom. And I said to him, ... but when you're in North Carolina, you miss your mom and you're homesick and you've cried, and so I gave him every opportunity that I could to manifest in some way that he really had a preference if it were only his decision, and [V.] weren't involved, to be with his mom, and when I challenged him, you know, how can you compare the two? Your mom has you during business time, and it's play time when you're with your dad, he's play dad and you're with play step mom, and he engaged me. As young as he is, he's a very bright child, and he engaged me substantively on that issue, and said, and he debated with me in an invested way and he said, I've seen dad be serious around school time. That his little brother goes to school and

he goes to school now and I've seen them when they get him ready for school. . . . I've concluded from talking to [B.] that he is independently invested in that.

In addition to having the trial judge's detailed narrative of the *in camera* interview, the lack of a transcript does not undermine our ability to review the trial court's decision in this case because the facts which the children related to the judge *in camera* were largely undisputed, and were corroborated by the parties themselves. For instance, appellant testified that "[appellee's wife] had hit [B.] in the mouth on one occasion." B. also mentioned the incident to the judge. Similarly, the children's desire to live with their father expressed to the judge *in camera*, had already been documented in the Guardian Ad Litem's Pre–Trial Report ("GAL Report"), which made clear that "[B.] and [V.] have both stated a strong preference to live with their father . . . in North Carolina." With respect to other aspects of the children's *in camera* interview, such as their complaint that they have to wake up everyday at 5:20 a.m. to go to school when they live with their mother, appellant did not challenge that assertion—nor any other of the children's assertions related by the judge from the *in camera* interview—at trial, either by offering contrary evidence or during closing arguments. Therefore, on this record, we have no reason to doubt that the trial court's decision is drawn from a firm factual foundation.[6]

We also conclude that appellant was not unduly prejudiced by the manner in which the trial judge used the *in camera* interview. The content of the children's interview, which was largely undisputed, was disclosed to the parties in open court. The judge expressed the concerns she had as a result of the interviews so that counsel could address them in closing argument. As noted, the children's preference to live with their father did not come as a surprise to appellant, as the GAL Report expressing the same sentiment had been made available to appellant pretrial. Appellant argues that she was prejudiced because the *in camera* interview took place after all the evidence was introduced. Appellant, however, did not ask to present additional evidence to counter or supplement what the trial judge was told by the children *in camera*, or to address the concerns the judge had expressed in connection with the interviews. Nor has appellant represented on appeal that she had any such evidence to present to the court.[7] As appellant has not shown that she was prejudiced by either the lack of a formal record of the children's interviews or the manner in which the trial court conducted the proceeding following the *in camera* interviews, we conclude that there is no reversible error.[8]

**6.** We note that appellant's counsel at no point during trial asked for a copy of the trial judge's notes or for a transcript of the *in camera* interviews. As noted, appellant's objection to the lack of recordation (which we find well-taken) is made for the first time on appeal. But the fact that counsel did not request a transcript in the trial court provides further support to our conclusion that appellant was not prejudiced by the lack of a transcript in presenting her arguments to the court.

**7.** Appellant contends that without a transcript, she cannot know exactly how the children were questioned and whether they may have been led by the manner in which the trial judge posed her questions to them. But if this was a concern, it should have been raised with the trial judge, who might have been able to resolve any questions about the manner in which the judge conducted the interview.

**8.** In cases where due to technical malfunction or other unexpected reason, a recording of a trial proceeding is not made, the rules of this

## III.

██ Finally, appellant challenges the trial court's decision to grant physical custody to the father during the school year. She argues that the trial court erred in finding that V. was at risk of further, more serious trouble at school and in his personal life if he continued to live with appellant, and that the trial judge exhibited a bias in favor of life in the country over an urban setting such as the District of Columbia. We do not think that the record supports these assertions.

██ We review a trial judge's findings of fact for clear error and will overturn them only if, after deferring to the judge's reasonable inferences and credibility determinations, they are not supported by the evidence. *See Jones v. United States,* 779 A.2d 277, 281 (D.C.2001) (en banc). As noted, the trial court based her finding on evidence of V.'s poor performance at school, which the court found "particularly worrisome." The record indicated that V. was suspended for fighting in the 2005–2006 school year-a problem that had persisted throughout "his entire schooling." According to what V. told the judge *in camera,* he failed two courses in his latest grading period. The court found that V.'s difficulties had worsened despite appellant's "responsible attempts to correct them." From these facts, the trial judge reasonably could determine that V.'s difficulties at home and at school were likely to continue if he continued to live with his mother during the school year. We will

not disturb this finding because it is supported by the record and is not clearly erroneous.

Appellant also argues that "[t]here is nothing in the record to suggest that North Carolina [where the children live when they are with their father] would resolve any problems, to the extent they exist," and that the trial judge exhibited a bias in favor of having children live in a country setting over the city. We agree that if the trial judge had such an immutable preference, it would constitute an abuse of discretion to grant custody to a parent simply because he lives in the country. But that is not what the trial judge did here. There was evidence in the record that V.'s move to North Carolina to be with his father would be beneficial to him. Appellant does not dispute, for instance, the factual finding that V. accepts his stepmother's parenting and has a warm relationship with her, as opposed to the argumentative relationship he has with appellant. Additionally, V. testified that "the thing he likes the best about being in North Carolina is visiting relatives and playing with his cousins. One cousin lives in the house next door to the right, and another in the house next door to the left." V.'s paternal grandparents are ministers whom the trial judge found to be "a positive presence" in V.'s life. Thus, the record reflects a number of specific features from which the trial judge could find that V. would likely benefit from living with his father in North Car-

court require that the parties attempt to supplement the record with a Settled and Approved Statement of Proceedings certified by the trial court. *See* D.C.App. R. 10. Although the situation presented by this case does not trigger the requirement of Rule 10, and neither party would have been able to propose or comment on the trial court's statement of proceeding, as contemplated by the Rule, we

can rely on cases involving Rule 10 Statements to the limited extent that they discuss this court's ability to review and affirm on a less than complete record of trial court proceedings. *See, e.g., David v. United States,* 957 A.2d 4, 6–9 (D.C.2008); *cf. Egbuka v. United States,* 968 A.2d 511, 515–19 (D.C. 2009).

olina.[9] Accordingly, we affirm the trial judge's order granting physical custody of the children to appellee during the school year.

*So ordered.*

See also 778 A.2d 330.

---

**9.** We note that if the change of environment does not result in the hoped-for improvement, V.'s custody is subject to modification if there is a material change in circumstances. *See* D.C.Code § 16–914(f) (2001).