**Tarik A. ABULQASIM, Appellant,**

v.

**Hadia K. MAHMOUD, Appellee.**

No.  08–FM–228.

District of Columbia Court of Appeals.

Argued March 31, 2010.

Decided Aug. 9, 2012.

Rahul Rao and Clint A. Carpenter, Washington, DC, for appellant.

Shelli L. Calland and Michael A. Schlanger, Washington, DC, for appellee.

Before FARRELL, REID,* and RUIZ,** Senior Judges.

RUIZ, Senior Judge:

Tarik A. Abulqasim[1] challenges the award of absolute divorce from Hadia K. Mahmoud, appellee, and distribution of marital property granted by the Superior Court. On appeal, he argues that the trial court (1) lacked subject-matter jurisdiction over the matter because neither party had been a bona fide resident of the District of Columbia for at least six months prior to appellant's filing of the divorce action; (2) abused discretion in admitting hearsay testimony regarding an email, not introduced into evidence, that alleged appellant was having an extramarital affair; and (3) erred in including a number of items appellant asserts were his separate property in the distribution of marital property. For the reasons that follow, we affirm.

## I. Statement of Facts

On July 14, 1993, Mahmoud and Abulqasim were married in Khartoum, Sudan, under Sharia law. Approximately one month later, they relocated to the United States, married each other again in the District of Columbia, and moved into a house owned by Abulqasim's brother located at 5160 H Street, S.E. Over the next eleven years, Mahmoud and Abulqasim had four children together and raised them at the H Street house. They purchased the house in May 1999.

In 2004, Abulqasim told Mahmoud that he would be moving their family to the Sudan to attain greater financial stability by starting a business there. Although Mahmoud thought life in D.C. was "hard" and too expensive, she did not initially agree with Abulqasim's decision because she believed the Sudanese economy and schooling system were "different" than in the United States; however, eventually Mahmoud consented to moving the family to the Sudan because she thought it was her duty to follow her husband.[2] Both parents also wanted their children to learn Arabic. The family's belongings were packed, and they departed for the Sudan on September 19, 2004. Abulqasim had purchased one-way plane tickets for Mahmoud and their children, and a round-trip plane ticket for himself, because he planned to return to complete their move.

---

* Judge Reid was selected to replace Judge Kramer on the division after her retirement on May 1, 2011.
** Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on July 2, 2012.

1. Appellant's last name is sometimes spelled in the record as "Abul Qasim." We adopt the spelling in appellant's brief.

2. When the parties were married in the Sudan, they agreed to apply the tenets of Islamic law to their marriage, which included separate and defined roles for the husband and wife.

By December of 2004, Abulqasim was disappointed with his situation in the Sudan—his business endeavors had not been successful, and the school system was not meeting his expectations. Abulqasim informed Mahmoud that he would travel back to the District of Columbia to "finish [his] income tax[es]," negotiate a settlement for an accident he had sustained while working for his prior employer, and ship their possessions to the Sudan, as they had previously planned. On December 12, 2004, Abulqasim departed for D.C. and left Mahmoud with approximately $1,300–$800 of which was to be used for the children's tuition. Abulqasim and Mahmoud agreed that she would stay with the children in the Sudan until February 2005 so that they could finish their school year while Abulqasim looked for employment either in the United States or the United Arab Emirates.

After Abulqasim returned to the District of Columbia, the parties spoke twice on the phone during the first week and had "normal" conversations; the following week, however, Mahmoud tried to contact Abulqasim approximately "fifteen times" but did not receive a response. Mahmoud was concerned about Abulqasim and asked her mother, who was living in D.C., to contact him on her behalf. Mahmoud's mother informed her that she had recently seen Abulqasim at the Sudanese Embassy in D.C., and without his knowledge, had observed him inquiring with a consular officer for information on how to divorce his wife. Mahmoud also asked one of her sisters, Hala, if she was aware of any information regarding Abulqasim. Hala directed Mahmoud to contact their other sister, Hagir,[3] who lived in the Sudan and had recently spoken with Abulqasim. Mahmoud believed Hagir would not be

forthcoming with information regarding Abulqasim, so she searched through Hagir's pocketbook. Mahmoud found a "torn up email from Tarik [Abulqasim] addressed to [Hagir]" that discussed Abulqasim's "love for [Hagir]" and a "plan" to have Hagir "leave Sudan and meet [Abulqasim] in Egypt." Mahmoud testified that she presented the email to Hagir, who admitted that she and Abulqasim "[we]re in love and [Abulqasim was] going to marry her as soon as he divorce[d] [Mahmoud]."

On January 18, 2005, Mahmoud returned to the District of Columbia with her children, having borrowed $6000 from a friend to pay for their airline tickets. The next day, Mahmoud telephoned Abulqasim, who told her that he did "not have any interest [in] talking to [her]," and that she could not use their children as an "excuse" to pursue him. Mahmoud and the children moved back into the H Street house; about a week later, when Abulqasim learned of this, he arranged to have all of the house's utilities turned off. Mahmoud and her children stayed with her mother for three to four weeks until Mahmoud was able to transfer the H Street house's utilities account to her own name. Mahmoud attempted to use her bank card to access her joint account with Abulqasim, but found it had "a zero balance," even though she thought there had been "at least $40–$50,000" in the account.

On January 14, 2005, Abulqasim had begun transferring money out of the parties' joint investment and checking accounts into a new checking account in Abulqasim's name alone. In all, Abulqasim deposited and transferred more than $166,000 into his personal Citibank account in 2005,[4] of which he wired $28,000 to

---

3. Hagir's name is sometimes spelled as "Hadier" in the transcript.

4. On July 7, 2005, Abulqasim deposited $75,000 from the workers' compensation set-

Hagir.[5] Abulqasim transferred an additional $20,000 to Hagir on January 3, 2006. Abulqasim admitted that he did not share any of this money with Mahmoud or their four children.

In January of 2005, the same month that Mahmoud and the children returned to D.C., Abulqasim traveled to the Sudan to try to obtain a divorce there from Mahmoud. On January 29, 2005, Abulqasim acquired a document, written in Arabic and issued by a "Khartoum Sharia court," that purported to grant him a divorce from Mahmoud.[6] Abulqasim then attempted to marry Hagir in the Sudan and acquired another document written in Arabic that Abulqasim alleged was a marriage certificate. Although Abulqasim denied at trial that he had a sexual relationship with Hagir in January 2005, he admitted that he had tried to marry her.

On June 2, 2005, Abulqasim filed a complaint in Superior Court seeking recognition of the Sharia Sudanese divorce or, in the alternative, an order from Superior Court granting him an absolute divorce from Mahmoud, sole custody of the parties' minor children, and distribution of

their marital property. On June 30, 2005, Mahmoud filed a response to the complaint, and a counterclaim for an absolute divorce from Abulqasim, sole custody of the children, child support, and an equitable distribution of property. Mahmoud filed an amended answer and counterclaim on July 20, 2005, and Abulqasim filed a response on July 26, 2005.

At the close of a three-day trial, the court concluded "in gross that ... Mahmoud's testimony is credible and I credit [it] and ... Abul[ ][q]asim's testimony is not credible and I d[id] not credit it on virtually every point of dispute, certainly on all the essential points of dispute." On January 31, 2008, the trial court denied recognition of the Sudanese divorce on due process grounds, see note 6, *supra,* granted the parties an absolute divorce, awarded sole custody of the children to Mahmoud with visitation rights to Abulqasim, and ordered child support payments by Abulqasim in the amount of $367 per month beginning on October 1, 2006, and distribution of property to Mahmoud.[7] Abulqasim filed a timely notice of appeal.[8]

tlement with his former employer; however, Abulqasim failed to explain the source of his other two major deposits in 2005: $9,000 on April 29, 2005, and $52,008.22 on May 16, 2005.

5. $10,000 on July 11, 2005, and $18,000 on July 25, 2005.

6. Mahmoud testified that she first learned of this document when Abulqasim returned to the United States and posted copies of the document in their H Street house. According to Mahmoud, she had not known about the Sudanese divorce proceedings, received no official notice, was not allowed a "discovery period," and had not participated in any way. Abulqasim conceded that Mahmoud had not been given official notice of the divorce in the Sudan, but testified that she knew about it and could have participated.

7. The court found that an earlier child support order issued by D.C. Superior Court requiring Abulqasim to pay $367 per month was "still in effect," and that "[a]ccording to the District of Columbia Support Clearinghouse, as of the date of the last hearing [May 30, 2007], Mr. Abul Qasim owed approximately $20,000 in child support." In this appeal, appellant does not specifically challenge the court's award of child custody or support.

8. On April 25, 2008, we dismissed Abulqasim's appeal because he did not file a statement regarding transcripts, as we had previously ordered on March 20, 2008. On August 6, 2008, Abulqasim filed a motion requesting that his appeal be reinstated, and on August 26, 2008, we granted Abulqasim's motion and reinstated his appeal.

## II.  Analysis

### A.  *Subject Matter Jurisdiction.*

Abulqasim contends that the trial court lacked subject matter jurisdiction to decide the parties' divorce action because neither party had been a bona fide resident of D.C. for at least six months prior to the filing of the complaint for divorce, as required by D.C.Code § 16–902 (2001). Appellant argues that he and Mahmoud lost their status as D.C. domiciliaries when they moved to the Sudan in September of 2004 with the intent to remain there indefinitely, and that even if Mahmoud's return to the District of Columbia on January 18, 2005, reestablished her residence here, it was not a full six months before he filed the complaint on June 2nd. Mahmoud contends that both she and Abulqasim remained legally domiciled in D.C. throughout their marriage and separation.

Although the issue of subject matter jurisdiction is a question of law we review de novo, *see American Univ. in Dubai v. District of Columbia Educ. Licensure Comm'n,* 930 A.2d 200, 207 n. 17 (D.C.2007), "the trial court['s] … finding that appellee was a resident of the District of Columbia for the requisite period for time may not be disturbed unless it is found to be clearly erroneous." *Williams v. Williams,* 378 A.2d 668, 669 (D.C.1977). "A finding is clearly erroneous 'when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Murphy v. McCloud,* 650 A.2d 202, 209–10 (D.C.1994) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

Each of the parties' complaints for divorce asserted that Mahmoud had been a resident of the District of Columbia for more than six months preceding the filing of the action. Even though on appeal Abulqasim takes the opposite stance than he did at trial when he invoked the Superior Court's jurisdiction, "'[p]arties cannot waive subject matter jurisdiction by their conduct or confer it … by consent, and the absence of such jurisdiction can be raised at any time.'" *Chase v. Pub. Defender Serv.,* 956 A.2d 67, 75 (D.C.2008) (quoting *Customers Parking, Inc. v. District of Columbia,* 562 A.2d 651, 654 (D.C. 1989)). Moreover, it is our duty to notice a lack of jurisdiction, and if the trial court lacked jurisdiction to hear the matter, then "our only choice would be to 'remand the case to the trial court with instructions to vacate its judgment as void and to dismiss the complaint for want of jurisdiction.'" *King v. Kidd,* 640 A.2d 656, 662 (D.C.1993) (quoting *Council of Sch. Officers v. Vaughn,* 553 A.2d 1222, 1228 (D.C.1989)).

The Superior Court's jurisdiction to grant a divorce is rooted in one of the parties' "bona fide residence" in the District of Columbia. D.C.Code § 16–902 (2001) ("No action for divorce or legal separation shall be maintainable unless one of the parties to the marriage has been a bona fide resident of the District of Columbia for at least six months preceding the commencement of the action."); *see DeGroot v. DeGroot,* 939 A.2d 664, 668 (D.C. 2008) (holding that the statute's six month residency requirement is jurisdictional in nature). The "bona fide residence requirement of § 16–902 has been construed to mean 'domicile.'" *Rzeszotarski v. Rzeszotarski,* 296 A.2d 431, 434 (D.C.1972) (quoting *Rogers v. Rogers,* 130 F.2d 905 (1942)), *overruled in part on other grounds by Bazemore v. Davis,* 394 A.2d 1377 (D.C. 1978), and *superseded on other grounds by statute as recognized by Albergottie v. James,* 470 A.2d 266, 269 (D.C.1983). To satisfy domicile, a person must establish: "(1) physical presence and (2) an intent to

abandon the former domicile and remain [at the new location] for an *indefinite period of time;* a new domicile comes into being when the two elements coexist." *Heater v. Heater,* 155 A.2d 523, 524 (D.C. 1959). "The 'intent' aspect of domicile .... 'is generally spelled out in terms indicating ... an intent to remain for an indefinite future time or, as sometimes stated in the negative, the absence of any intention to go elsewhere ...'" *Rzeszotarski,* 296 A.2d at 435 (quoting *Jones v. Jones,* 136 A.2d 580, 582 (D.C.1957)), but does not require "an affirmative intent to remain ... *permanently* " in the new domicile. *Heater,* 155 A.2d at 524. "[A] domicile once existing continues until another is acquired; a person cannot be without a legal domicile somewhere." *Id.* To show a change of domicile, "the facts adduced must demonstrate that such persons 'have no fixed and definite intent to return and make their homes where they were formally domiciled.'" *Alexander v. District of Columbia,* 370 A.2d 1327, 1329 (D.C.1977) (quoting *District of Columbia v. Murphy,* 314 U.S. 441, 454–55, 62 S.Ct. 303, 86 L.Ed. 329 (1941)). "The burden of proving both elements—presence *and* intent to establish a new place of abode—is 'on the party who claims that a change of domicile has taken place.'" *In re Derricotte,* 744 A.2d 535, 538 (D.C.2000) (quoting *Bartell v. Bartell,* 28 Md.App. 180, 344 A.2d 139, 143 (1975)).

The trial court found that "[e]xcept for occasional trips to the Sudan, ... Mahmoud has lived in the District of Columbia in the H Street house without interruption since the start of her marriage in 1993.

Consequently, ... Mahmoud has been a bona fide resident of the District of Columbia for far longer than six months, and [the parties] are permitted to seek a divorce ..." On appeal, Abulqasim challenges the court's finding of Mahmoud's D.C. residency as clearly erroneous, pointing to a statement earlier in the court's Order that "in mid-September 2004, [the parties] and their four children left for Khartoum, Sudan, *with the intent to remain there permanently* " (emphasis added). Upon an independent review of the entire record, we conclude that these two statements, although facially incongruent, are not substantively inconsistent when read in context. The statement on which appellant relies was not within the Order's section containing the court's conclusions of law, but was part of the trial court's recitation of the parties' account of the events that led to their separation, and is directly contradicted by the trial court's determination, in the section entitled "Conclusions of Law," that "[e]xcept for the occasional trips to the Sudan, Ms. Mahmoud has lived in the District of Columbia in the H Street House without interruption since the start of her marriage in 1993." Thus, that one statement, viewed in isolation, does not render the trial court's ultimate finding that Mahmoud was a District of Columbia resident clearly erroneous.

Evidence in the record, viewed as a whole, supports the trial court's finding that Mahmoud was a bona fide resident of D.C. for at least six months preceding the filing of Abulqasim's divorce action in June 2005.[9] The trial court

---

9. To the extent that the trial court's findings with respect to jurisdiction were not as detailed as appellant now claims they should have been, at least part of the responsibility lies with appellant, who in his complaint for divorce asserted that Mahmoud "has been a bona fide resident of the District of Columbia for more than six months immediately preceding" the filing of the complaint. At no point during the proceedings before the trial court did Abulqasim challenge the court's jurisdiction or Mahmoud's allegation of bona fide residence in her counterclaim. To the contrary, in his answer to Mahmoud's amend-

based its findings on credibility determinations of the parties. We defer to the trial court's assessment in crediting Mahmoud and finding that Abulqasim's testimony was inconsistent and incredible. *See N.D. McN. v. R.J.H., Sr.,* 979 A.2d 1195, 1205 (D.C.2009). Mahmoud testified that she had been reluctant to move the family away from the District of Columbia, and, when once in the Sudan her concerns were validated and she got word of Abulqasim's plans to divorce her, she immediately returned to her home in the District of Columbia. In addition, the record indicated that the parties' furniture and belongings remained in the H Street house, which still had "working gas, electricity, water and other utilities"; the parties had also kept their joint Citibank checking account, which was based in D.C., and continued to use that account while in the Sudan. Mahmoud's reluctance to move the family to the Sudan casts doubt on whether she ever formed the intent to abandon her residence in D.C. Moreover, her acquiescence was based on deference to her then-husband's wishes to move the family to the Sudan. This deference was based on a false premise and a misrepresentation, however, as the trial court found that "Abul Qasim never meant to retrieve his wife and four children from the Sudan, and instead intended to abandon them there." It must have seemed obvious to the trial court that had Mahmoud known of Abulqasim's real plan for her and the children, she is unlikely to have left her home in the District of Columbia where she had lived with them for eleven years. Her ambivalent intent, moreover, was not accompanied by the requisite type of concurrent physical presence in the Sudan. "Intent alone to establish a new place of abode without physical presence there is neither sufficient to abandon a former domicile nor to establish a new one. There must be a concurrence of the two requisites before a new domicile comes into being." *Jones v. Jones,* 136 A.2d 580, 581–82 (D.C.1957). Abulqasim testified that taking his family to the Sudan was only a "trip" or "trial period" to explore potential business opportunities. A "temporary visit" does not result in a change of domicile, and " 'mere absence from a fixed home, however long continued, cannot work the change [in domicile].' ... [We] do not understand physical presence to mean only a temporary visit. There must be the establishment of a new physical residence." *District of Columbia v. Woods,* 465 A.2d 385, 387 (D.C.1983) (quoting *Shilkret v. Helvering,* 138 F.2d 925, 927 (App.D.C.1943)). Thus, even though Mahmoud was physically in the Sudan for sixteen days in January 2005, within the six months prior to the filing of the divorce action in Superior Court on June 2, the trial court could find that Abulqasim did not bear his burden of establishing that Mahmoud intended to remain in the Sudan indefinitely or possessed an "absence of any intention to go elsewhere...." *Rzeszotarski,* 296 A.2d at 435 (quoting *Jones,* 136 A.2d at 582), such as to abandon her long-established domicile in the District of Columbia.[10] Thus, we will not disturb the trial court's finding that Mahmoud was a bona fide resident of the District of Colum-

ed counterclaim, he "stipulates" to Mahmoud's allegation of residence.

**10.** Because we conclude that the trial court did not clearly err in finding that Mahmoud was a bona fide resident of D.C. for at least six months prior to the filing of the divorce action by Abulqasim, we do not reach appel-

lee's argument that she established jurisdiction for her cause by filing her counterclaim in Superior Court on June 30, 2005—more than six months after she returned to D.C. from the Sudan—or appellant's contention that a counterclaim cannot survive the dismissal of a complaint for lack of jurisdiction.

bia at least six months prior to the filing of the divorce action, and conclude that the trial court had jurisdiction to hear and decide the case.

### B. Admission of Testimony about Email.

██ Abulqasim contends that the trial court abused its discretion by admitting testimony about an email from Abulqasim to Hagir that was not itself introduced into evidence, which he claims was in violation of the best evidence rule. The email was important, he claims, because it formed the basis of the trial court's finding that Abulqasim had an "improper relationship" with Hagir which, according to appellant, was the reason for the trial court's distribution of the marital assets to Mahmoud. Appellee responds that the best evidence rule was not violated and that the trial court properly decided the distribution of the marital assets through an analysis of all of the statutory factors set forth in D.C.Code 16–910(b), one of which was Abulqasim's transfer of "tens of thousands of dollars" to Hagir, and that there were "many incontrovertible pieces of evidence" to support this finding. We agree there was no abuse of discretion.

██ "The best evidence rule requires that when the contents of a writing are to be proved the original must be produced unless its absence is satisfactorily explained." *Walker v. United States,* 402 A.2d 813, 813–14 (D.C.1979). "Secondary evidence of the contents of the writing is admissible on proof that the original is lost." *Id.* at 814. "A reasonable discretion is vested in the trial court in the application of the best evidence rule." *Id.* "In evaluating a claim of abuse of discretion by the trial court, 'we must determine, first, whether the exercise of discretion was in error, and, if so, whether the impact of the error requires reversal.'" *Foreman*

*v. United States,* 792 A.2d 1043, 1052 (D.C. 2002) (quoting *Hollingsworth v. United States,* 531 A.2d 973, 978 (D.C.1987)); *see Johnson v. United States,* 960 A.2d 281, 295 (D.C.2008) ("[I]f we find [error], we must consider whether it was harmless."). In this case, we discern neither error nor prejudice.

At trial, Mahmoud testified that she found a "torn up email" from Abulqasim to Hagir that discussed Abulqasim's "love for [Hagir]" and a "plan" to have Hagir "leave Sudan and meet [Abulqasim] in Egypt." Mahmoud testified that when she confronted Hagir, she confirmed the existence of the email and the veracity of its contents. Abulqasim argues that Mahmoud failed to satisfy her burden of proving that she performed a "diligent search for the email," and that her only explanation—that she "ha[d] a whole lot of stuff stolen ... from [her] while [she] was in Sudan ... and I believe one of them [wa]s the email"—was insufficient. In admitting Mahmoud's testimony concerning the email, the court recognized that testimony about the contents of the writing was hearsay, but ruled that it was not being admitted to prove the truth of a romantic relationship between Abulqasim and his sister-in-law. The court exercised reasonable discretion by admitting the testimony as evidence only to the extent it explained Mahmoud's actions and not as evidence "that ... could ... come in for the truth of the matter asserted"—the matter asserted being that Hagir and Abulqasim were having a romantic relationship. Thus, the best evidence rule did not apply. *See Meyers v. United States,* 171 F.2d 800, 813 (D.C.Cir.1948) (stating the "[best evidence] rule is applicable when the purpose of proffered evidence is to establish the terms of a writing"); *Henson v. United States,* 287 A.2d 106, 110 (D.C.1972) ("The requirement [of the best evidence rule]

that the document itself is the sine qua non applies only when the terms of the document are essential."); *see also Mercer v. United States*, 864 A.2d 110, 118 (D.C. 2004) ("'If a statement is not offered to prove the truth of the matter asserted it is not hearsay.'" (quoting *Burgess v. United States*, 786 A.2d 561, 570 (D.C.2001))). Appellant's argument that this email was "the reason for the trial court's equitable distribution of the marital assets" is not supported by the record because the court ruled that testimony about the email was not admitted as substantive proof of the relationship.

Moreover, to the extent the court mentioned Abulqasim's relationship with Hagir, it was in connection with his decision to abandon his wife and children and transfer marital funds to Hagir. In its findings, the trial court did not mention the email,[11] but relied on "all the evidence (including Abulqasim's testimony)." Abulqasim testified that he had attempted to divorce Mahmoud and marry Hagir in January 2005 in the Sudan; bank records showed that he had transferred to Hagir almost $50,000 of marital assets in 2005 and 2006.

C. *Assignment of Separate Personal Property.*

▮ Appellant argues that the trial court erred when it did not assign to Abulqasim his separate personal property acquired prior to his marriage to Mahmoud. Specifically, he identifies "most of the 300 items of personal property … in Defendant's Exhibit 32," which was a packing inventory prepared in 2004 prior

to the departure to the Sudan that included a list of books, furniture, computers, and kitchen utensils and dishware, that were his alone and should not have been considered part of the marital assets.

▮ D.C.Code § 16–910(a) (2001) provides that "[u]pon entry of a final decree of … divorce …, the Court shall … assign to each party his or her sole and separate property acquired prior to the marriage …."; and then distribute "all other property accumulated during the marriage," i.e., marital property. D.C.Code § 16–910(b). The trial court noted this statutory obligation and recited the substance of the relevant portions of the D.C.Code in the Order. We review the trial court's determination of ownership of sole property for an abuse of discretion. *See Sanders v. Sanders*, 602 A.2d 663, 668 (D.C.1992).

▮ As the trial court recognized, the party who claims sole and separate ownership of a particular item bears the burden of establishing that the item is not marital property. *See Barnes v. Sherman*, 758 A.2d 936, 940 (D.C.2000); *Jordan v. Jordan*, 616 A.2d 1238, 1239 (D.C.1992). Abulqasim testified that "all" of the items on the inventory list were in the "house before [Mahmoud] came from Sudan" in 1993; on appeal he asserts that he owned "most of the items" on the inventory packing list prior to the marriage—a fact which Mahmoud generally conceded at trial. Abulqasim has never identified with specificity which items on the 2004 inventory list were his personal property in 1993. The ownership of the items on the packing list, however, was not a focus of the parties

---

11. Appellee's proposed findings of fact and conclusions of law submitted to the trial court on June 8, 2007, included a description of the contents of the email and the confrontation between Mahmoud and Hagir regarding the email. The trial court's final January 31, 2008 Order excluded this evidence and mentioned only that Mahmoud had spoken to Hagir, who confirmed Mahmoud's suspicions about the affair. This further demonstrates that the trial court did not rely on the email in concluding that Abulqasim and Hagir had a romantic relationship.

at trial—their dispute centered on owner-ship of the H Street house and the where-abouts of their funds—and the trial court did not address these items in the Order. It appears to be a non-issue, raised as an afterthought on appeal.[12]

Even if we were to assume, for present purposes, that Abulqasim met his burden of establishing sole and separate owner-ship of the household items, this does not necessarily mean, however, that Mahmoud could not possess an equitable interest in this property. *See Sanders,* 602 A.2d at 667–668. In *Brice v. Brice,* 411 A.2d 340, 343 (D.C.1980), we considered, for the first time, the issue "whether property which originally was acquired by a spouse in one of the ways enumerated in § 16–910(a) could ever, under the particular circum-stances of a given marriage, come to be considered property subject to distribution under § 16–910(b)." We noted that:

> [b]efore enactment of the 1977 Marriage and Divorce Act, property owned by one spouse could be distributed to the other upon dissolution of the marriage only if 'some right or element of ownership, legal or equitable,' could be found in the spouse who did not hold title ... The language of the new Act does not indi-cate an intent to abolish or restrict this long-standing approach to 'sole and sep-arate' property of a spouse, vesting the trial court with broad discretion in mak-ing such determinations.

*Id.* at 343 (citations omitted). Similarly, in *Yeldell v. Yeldell,* we recognized that "a divorce court, exercising its general equity power, could apportion individually owned property, but in order to do so, 'the court

was required to find that the non[-]titled spouse had a legal or equitable interest in the property.'" 551 A.2d 832, 834 (D.C. 1988) (quoting *Hemily v. Hemily,* 403 A.2d 1139, 1142 (D.C.1979)).[13] Here, the trial court found that Mahmoud "made substan-tial non-monetary contributions to her family[ ]....", sacrificed her "desire to work outside of the home" as a result of her husband, and "expended considerable time and energy to keep her family finan-cially afloat. The trial court stated that were it not for her efforts "to save the H Street house from foreclosure and auction, ... [it] would not even exist as a marital asset to distribute."

In determining the distribution of marital property, the trial court applied the factors delineated in D.C.Code § 16–910(b) (2001) to the facts, including: (1) the duration of the marriage; (2) Mah-moud's contributions to the family's health and happiness; (3) Mahmoud's de-sire to work outside of the home, which Abulqasim had prevented her from doing; (4) Abulqasim's ability to seek profitable employment and refusal to seek a job commensurate with his skills since his separation from Mahmoud; (5) Abulqas-im's cancellation of joint credit cards and depletion of marital joint investment ac-counts, repeated travels to Africa and the Middle East, and transfer of "tens of thousands of dollars to a woman other than his wife"; (6) Mahmoud's substantial debt incurred for the care of the four children; (7) Mahmoud's improvements to the H Street house; and (8) Mahmoud's limited earning capacity. The court awarded Mahmoud eighty percent of the

---

**12.** In her brief on appeal, Mahmoud states that she has "repeatedly made it clear that she would allow Abulqasim to have almost every piece of his alleged 'personal property' that he has demanded, provided that the property is still within her possession or con-trol, and will gladly arrange a time with him to facilitate this transfer."

**13.** There has been no change in the relevant statutory language since *Brice* and *Yeldell* were decided.

parties' total assets that the court deemed marital property: the parties' marital home in the District of Columbia, a parcel of property in the Sudan, both of the parties' vehicles, the $75,000 workers' compensation settlement, the $91,000 remaining from Abulqasim's deposits and transfers to his personal checking account in 2005, and all other deposits into Abulqasim's personal checking account. However, because "the vast majority of the parties' marital assets ha[d] already been lost as a result of ... [Abulqasim's] apparently reckless spending and that [the assets] either simply do not exist, or [we]re beyond the [c]ourt's reach," the trial court awarded Mahmoud "full ownership and possession of the parties' four remaining tangible assets": the H Street house, the property in the Sudan, and the parties' two vehicles. These four assets had an estimated value of "well less than $40,000," [14] significantly less than the amount Mahmoud would have received, but for Abulqasim's dissipation of marital assets.[15] "As long as the trial court considers the relevant statutory factors 'in a manner that is equitable, just and reasonable,' we will not disturb its conclusions on appeal." *Bansda v. Wheeler*, 995 A.2d 189, 197 (D.C.2010) (quoting *Young–Jones v. Bell*, 905 A.2d 275, 277 (D.C.2006)). In light of the trial court's findings, we perceive no abuse of discretion in the trial court's distribution of property. To the extent that the trial court's Order did not specifically address the household items in the H Street house, we think that they are generally subsumed in the court's overall disposition of all available assets to Mahmoud to compensate for Abulqasim's "squandering" and attempts to hide marital property that otherwise would have helped support Mahmoud and the children.

Accordingly, because we conclude that the trial court had jurisdiction and did not abuse discretion in distributing the marital property, we affirm the trial court's judgment.

*So ordered.*

14. The parties had approximately $10,000 in equity in the H Street house; the unimproved Sudan property had been purchased for $6,000; the 1997 Chrysler minivan cost $6,000 and was in poor condition; the 1999 Toyota Landcruiser was valued at $17,000.

15. Mahmoud would have received approximately $196,000, representing 80% of the parties' total marital funds, which included: $25,274.80 (Abulqasim's original deposit into his sole account) + $91,000 (deposits/transfers to Abulqasim's sole account in 2005) + $20,000 (transfer to Hagir in 2006) + $75,000 (workers' compensation settlement) = $211,274.80.